IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BARBARA KELLY WILSON,               )
                                    )        No. 04-1142-HU
                Plaintiff,          )
                                    )
        v.                          )
                                    )        OPINION AND ORDER
JOANNE BARNHART, Commissioner )
of Social Security,                 )
                                    )
                Defendant.          )
_____)

Linda Ziskin
4800 S.W. Meadows Road, Suite 300
Lake Oswego, Oregon 97035
Richard Sly
1001 S.W. Fifth Avenue, Suite 1901
Portland, Oregon 97204
        Attorneys for plaintiff

Karin Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
888 S.W. Fifth Avenue, Suite 1000
Portland, Oregon 97204-2024
Lucille Meis
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, Washington 98104
        Attorneys for defendant

OPINION AND ORDER Page 1

1   HUBEL, Magistrate Judge:

2       Barbara Wilson brought this action pursuant to 42 U.S.C. §

3   405(g), to obtain judicial review of a final decision of the

4   Commissioner of the Social Security Administration (Commissioner)

5   denying her application for disability benefits and Supplemental

6   Security Income (SSI) benefits.

7                        **Procedural Background**

8       Ms. Wilson filed applications for disability and SSI benefits

9   on January 26, 1994, and was awarded benefits as of August 25,

10  1993. Her disability was terminated on January 1, 1997, with

11  benefits payable through March 31, 1997, on the ground of medical

12  improvement. Ms. Wilson challenged the termination, and a hearing

13  was held before Administrative Law Judge (ALJ) Jean Kingrey. On

14  June 18, 1998, ALJ Kingrey filed a decision upholding the

15  termination, finding that Ms. Wilson had a seizure disorder, but

16  was capable of light work. The Appeals Council denied Ms. Wilson's

17  request for a review of that decision, and Ms. Wilson brought an

18  action in United States District Court. On March 20, 2001, the

19  District Court affirmed the decision of the Commissioner.

20      Meanwhile, on October 21, 1999, Ms. Wilson filed additional

21  applications for benefits, which were denied initially and on

22  reconsideration. ALJ Dan R. Hyatt held hearings on May 20, 2002 and

23  on November 14, 2002. On February 27, 2003, he issued a decision

24  finding Ms. Wilson not disabled. On July 23, 2004, the Appeals

25  Council denied her request for review, making the ALJ's decision

26  ///

27

28  OPINION AND ORDER Page 2

the final decision of the Commissioner. This decision is appealed here.

## Factual Background

Born February 27, 1952, Ms. Wilson was 51 years old at the time of the ALJ's decision. She alleges disability since August 25, 1993, based on cognitive deficits secondary to surgery to remove a tumor from the right frontal lobe, migraine headaches, visual impairment, depression, anxiety, and adverse side effects from prescribed medications. She has an 11th grade education. Her past relevant work is as a waitress, bartender and cleaner.

## Medical Evidence

In 1977, Ms. Wilson underwent surgery to remove a benign tumor, a right frontal lobe cavernous hemangioma. Tr. 226. An MRI on July 12, 1985 showed that the right frontal horn was greatly enlarged and expanded, with an area of brain loss. Id. There were also scattered periventricular high intensity areas in the white matter which could have been focal areas of infarcts or areas of demyelinization. Id. On the basis of the MRI, Mary Burry, M.D. concluded that there was moderate loss of brain substance in the right frontal region with ipsilateral frontal horn enlargement and scattered focal high intensity areas of the periventricular region representing areas of focal brain injury. Id.

An EEG done in August 1985 was "borderline to moderately abnormal," consistent with a seizure disorder. Tr. 227.

In December 1992, an MRI of the head showed right frontal craniotomy changes, indicating tissue loss in the right frontal

OPINION AND ORDER Page 3

lobe as a result of tumor resection, but no obvious residual tumor or mass. Tr. 228.

On November 6, 1996, Ms. Wilson was given a neuropsychological screening by David Northway, Ph.D. Tr. 229. She had been receiving disability and SSI benefits for approximately two to three years, for seizure disorder. Id. Dr. Northway observed that Ms. Wilson's affect was "somewhat labile," and that she had "word-finding problems and tended to be disinhibited, with a tangential and confusing quality to her stories." She was also observed to be "quite fidgety, anxious, and talkative." Id. Dr. Northway assumed that some of Ms. Wilson's disinhibition and communication problems were "directly related to the frontal lobe damage." Tr. 233. Ms. Wilson appeared "honest, with no obvious signs of symptom exaggeration, distortion, or malingering." Tr. 229.

Ms. Wilson reported that she began having seizures approximately 19-20 years earlier, followed by surgery for a benign tumor, but that the seizures had continued after the surgery, sometimes as many as four or five a day. Tr. 230. She was currently on Dilantin, after being tried on Depakote previously. Id. She took herself off Dilantin for three years because she disliked the side effects, but restarted it after a particularly severe seizure in August 1996. Id. She related that she generally has an aura or some prodromal signs of an approaching seizure, and that afterwards, she often has migraine headaches, nausea, and exhaustion. Id.

Dr. Northway found no signs of thought disorder or psychotic processes other than her disinhibited and sometimes tangential

speech. Tr. 231. She did relate a serious suicide attempt by asphyxiation four to five years previously. Id.

Ms. Wilson completed the Trail Making Test, with results indicating that she was at the 2nd percentile for both Part A and Part B. Tr. 232. These results were more than two standard deviations below normal. Tr. 233. Dr. Northway opined that the scores showed Ms. Wilson "has problems with sustained attention and information processing. This performance is consistent with what one might expect based on her brain injury." Tr. 232. In Dr. Northway's opinion, Ms. Wilson's impaired information processing and memory functioning indicated that she would "probably need repetition and the use of compensatory strategies to perform adequately in a work place." Tr. 233. Ms. Wilson's scores on the Wechsler Memory Scale, Revised (WMS-R) were in the low average range. Tr. 232. Visual memory and verbal memory were approximately in this range as well. Her delayed recall scores fell in the mildly impaired range. Id. Her scores on the Wechsler Adult Intelligence Scale, Revised (WAIS-R) showed a verbal IQ of 94, a performance IQ of 92, and a full scale IQ of 93, all within average range. Ms. Wilson's performance on the Trail Making Test, Part B, was within the second percentile, indicating problems with sustained attention and information processing. Id.

Dr. Northway thought Ms. Wilson was impaired in her social functioning because of her communication problems, specifically her disinhibition and her inability to track the point of her conversation. Id. Dr. Northway noted that an additional problem was

OPINION AND ORDER Page 5

Ms. Wilson's "apparent distrust of many people." Tr. 233-34.

Dr. Northway concluded,

> [Ms. Wilson's] primary cognitive deficits from her brain tumor are most likely to be seen in the areas of executive functioning and problem solving. They affect her information-processing skills and possibly memory. They also appear to affect personality ... particularly in communications and relationships. It is somewhat difficult to determine, but [Ms. Wilson] may also have some psychological problems related to her abusive relationships and a childhood history of abuse. These tend to play out in an anxiety disorder which is magnified by her fear of seizures. It is likely that the stress of regular employment would exacerbate these symptoms and may lead to further decompensation.

Tr. 234. Dr. Northway diagnosed Cognitive Disorder, Not Otherwise Specified (NOS); personality change due to brain surgery and tumor removal, primarily labile and disinhibited type; and adjustment disorder with mixed anxiety and depressed mood. He assessed her GAF at 48.[1] Id.

An MRI of the brain on October 13, 1997 showed at least two discrete, focal areas of lacunar infarction, one in each parietal lobe and multiple abnormal areas of either deep white matter ischemia or possible demyelinating disease. Tr. 236.

On March 31, 1999, Ms. Wilson started treatment with Ole Hansen, M.D. Tr. 225. Ms. Wilson related that she had previously

---

[1] The Global Assessment of Functioning (GAF) scale measures the overall severity of psychiatric disturbance. A GAF between 50 and 41 indicates serious symptoms or any serious impairment in social, occupational, or school functioning; a GAF between 40 and 31 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000) (*DSM-IV-TR*).

received disability benefits, but lost them. Id. She reported ongoing problems with memory and concentration and chronic migraines, occurring approximately twice a week, and lasting for up to three or four days. Id. Ms. Wilson reported that she received benefit from Imitrex for the migraines, but could not afford it because her insurance did not cover it. Id. She also reported a longstanding history of depression, increasingly problematic over the past two years. Id. Dr. Hansen restarted her on Paxil, gave her a trial of Amerge for headache control, and continued her on the same dose of Dilantin. Id.

On April 16, 1999, Dr. Hansen saw Ms. Wilson for followup on a concussion.[2] Tr. 224. She reported continuing to have significant symptoms of depression. Dr. Hansen wrote,

> [I]n fact feels some worsening of her symptoms, in part related to some family problems. Feeling very down and emotional. Also feels she has some problems with the Paxil ... a feeling of jitteriness and at the same time some mental slowing and sedation. Excellent response to the Amerge as far as her migraine headaches.

Id. Dr. Hansen discontinued the Paxil and started her on Effexor. Id.

In a letter dated May 5, 1999, Kathleen Fitzgerald, M.D., a neurologist, wrote that she had seen Ms. Wilson that day for a neurological examination. Tr. 239. Dr. Fitzgerald noted that Ms. Wilson reported having seizures despite being on five Dilantin per day. Id. However, for the previous year the seizures had been nocturnal only, occurring about once a month. Id.

---

[2] The medical record does not contain any other references to the concussion.

OPINION AND ORDER Page 7

Ms. Wilson gave a history of severe headaches for the past six or seven years. Tr. 240. She stated that they occurred three to four times a week, and lasted from six hours to three days. Id. She had recently been started on Amerge by her primary physician, which she felt to be helpful, and several days a week she used three to four Excedrin for milder events. Id.

Physical examination revealed that she was "mildly tremulous and ... a vague and tangential historian." Id. Coordination was fair. Id. Dr. Fitzgerald's impression was as follows:

> I would expect that her seizure disorder would continue and that control as good as she has had or possibly even better could be achieved with appropriate medication modification. With regard to her memory complaints further testing is necessary.... Patient ... is noted to be mildly tremulous and mildly unsteady but would certainly be able to engage in the functional activities described such as lifting five pounds occasionally for [sic] sitting, standing, or alternating sitting and standing for several hours per work day to manipulate objects and to be independently mobile outside the home without the use of mechanical aids. I think she does need ongoing treatment because her condition will deteriorate without treatment.

Tr. 241.

On June 16, 1999, Ms. Wilson reported doing significantly better since being put on Effexor, feeling a marked improvement in her mood. Tr. 223. She had also found Amerge effective in management of her migraines. Id. Her anxiety problems remained essentially unchanged. Id. She was continued on Effexor, Amerge, and Dilantin. Id.

On October 12, 1999, Dr. Hansen wrote that Ms. Wilson had good control of her depression with the Effexor. Tr. 222.

On February 11, 2000, Ms. Wilson reported increasing symptoms

OPINION AND ORDER Page 8

of depression, "mainly a general lack of interest." Tr. 222. She said she had trouble getting motivated and described her emotional well-being as "gray," although she was taking the Effexor and had no severe downs or thoughts of suicide. Id. She also reported increasing problems with migraines. Id. Although Amerge had been beneficial, it was not covered on her insurance and she was using Midrin with some benefit. Id. Dr. Hansen increased her Effexor to 150 mg. daily and gave her some samples of Amerge and a refill of the Midrin prescription. Id.

On April 3, 2000, Ms. Wilson saw Dr. Hansen for symptoms of anxiety and depression, although improved with the Effexor SR. Tr. 221.

On April 27, 2000, Ms. Wilson was given a psychological evaluation by David R. Truhn, Psy. D. Tr. 199. Dr. Truhn noted that Ms. Kelly's eye contact was fleeting because of headshakes and eye twitches. Id. Her gait was slow and unsteady with poor balance, and her speech was shaky and "pressured at times." Id. Dr. Truhn administered a number of psychometric tests, including the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), which revealed that Ms. Wilson had a verbal IQ of 84, a performance IQ of 76, and a full scale IQ of 78, which placed her in the borderline range of abilities. Tr. 203. Dr. Truhn concluded that psychological testing indicates that Ms. Wilson seemed to be having "severe problems" with attention, concentration, and short-term memory. Id. Scores
///
comprising freedom from distractibility fell in the mentally

1  deficient range. Id.

2      On the Minnesota Multiphasic Personality Inventory-2 (MMPI-2),
3  Ms. Wilson responded in a fashion similar to that of individuals
4  manifesting clinically severe neurotic or psychotic problems or
5  severe depression. Id. Dr. Truhn noted that similar individuals
6  tended to "present with somatic complaints. There may be secondary
7  gain associated with the symptoms." Id. Trail Making Test Parts A
8  and B indicated cognitive deficits. Tr. 204.

9      Dr. Truhn's diagnoses were Cognitive Disorder, Not Otherwise
10 Specified, Dysthymic Disorder, early onset; Obsessive-Compulsive
11 Disorder, with poor insight, Dependent Personality Disorder, and
12 Borderline Intellectual Functioning. Id. Dr. Truhn assigned a
13 current GAF of 40.

14     Dr. Truhn concluded:

15         The psychometric testing indicates that she is
           functioning in the borderline range of intellectual
16         abilities. ... There are significant deficits in the
           areas of short-term memory, concentration and
17         mathematical abilities, and visual transcription. These
           three scores comprise the freedom from distractibility
18         score which also falls in the mentally deficient range.
           The personality inventory is indicative of depression,
19         somatic complaints, disorganized thought processes and
           lethargy. The neuropsychological screening test is
20         indicative of cognitive deficits.

21 Tr. 205. Dr. Truhn thought Ms. Wilson's prognosis was poor, and
22 that her problems were long-standing, without signs of remission.
23 Id.

24     On September 8, 2000, Ms. Wilson had a psychodiagnostic
25 evaluation and memory assessment from William A. McConochie, Ph.D.
26 Tr. 206. Ms. Wilson said she spent much of an average day lying

27

28 OPINION AND ORDER Page 10

down because of migraine headaches. Tr. 207.

Dr. McConochie noted that Ms. Wilson talked in a "somewhat shaky manner and her hands seem somewhat tremulous." Tr. 209. Dr. McConochie did not administer an intelligence test, but noted that she was able to answer only six of 10 questions designed to assess basic intelligence, which Dr. McConochie found "consistent with her test measured borderline intellectual functioning earlier this year." Ms. Wilson was able to remember three unrelated words immediately, but none of the three after several minutes, suggesting significant memory limitations. Tr. 210.

Dr. McConochie administered the Wechsler Memory Scale, Third Edition (WMS-III), on which Ms. Wilson obtained a score indicating that her memory was in the borderline range. Tr. 211-12. This score was "virtually identical" to her full scale IQ of 78. Tr. 212. Dr. McConochie diagnosed dysthymic disorder, relatively well managed with Effexor and borderline intellectual and memory functioning. Tr. 212. He assessed her GAF currently and for the past year at 35 and noted, "In addition to her moderate depression, Barbara appears to be preoccupied with general resentment and anger which makes some of her conversation comments tangential and self-indulgent. This could be expected to interfere with her concentration on the job." Id.

Dr. McConochie concluded,

> Barbara is a woman troubled by mild to moderate depression and unresolved anger. She is functioning in the Borderline Range in both intelligence and memory functioning. She apparently has a relatively low tolerance for stress, being vulnerable to headaches and seizures under stress. ... Prognosis would appear guarded

OPINION AND ORDER Page 11

given the chronicity and multiplicity of her problems.

Tr. 213.

On September 27, 2000, Paul Rethinger, Ph.D., a psychologist, did a records review on behalf of Social Security Administration. Tr. 180. Dr. Rethinger found that Ms. Wilson had borderline intellectual functioning, dysthymia, and a personality disorder. Id. Dr. Rethinger found that Ms. Wilson had a mild degree of limitation in activities of daily living, but that she had moderate limitations with respect to maintaining social functioning and maintaining concentration, persistence, or pace, tr. 190, in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, tr. 194, the ability to interact appropriately with the general public, and the ability to set realistic goals or make plans independently of others. Tr. 195.

Ms. Wilson was seen on October 17, 2000 by L. Bufton, M.D., Ph.D., for a neurological evaluation lasting approximately 30 minutes. Tr. 215-16. She described her seizures as grand mal, and said she had a warning consisting of a panicky feeling for 25-60 seconds after which she could sometimes feel her head turn, her eyes roll back, and a loss of consciousness. Tr. 215. She reported that she is out for up to 45 minutes, and when she awakens she is exhausted for the rest of the day. Id. Her last seizure had been approximately a month earlier, and she had had about six so far that year. Id. Ms. Wilson reported that her seizures seemed to be

OPINION AND ORDER Page 12

triggered by stress, but that they were improved on Dilantin. Id. She reported getting migraine headaches once or twice a week. Id. The headaches were normally helped with Imitrex, but she was currently unable to afford it, so she used Excedrin Migraine with lesser results. Id. She related that she had gradually decreasing memory for several years, and that she felt poorly motivated, unable to care about her dirty house and overrun garden. Id. Ms. Wilson was currently taking 500 mg of Dilantin per day, Effexor for depression, and Excedrin Migraine for headaches. Id.

Dr. Bufton's observation of her mental status was "reasonably good," but he qualified this by saying, "I would rely on full neuropsychiatric testing that indicates borderline intellect and memory." Id. Motor examination showed she was "a little jerky" when holding her arms outstretched, but when relaxed, the tone in her arms was "quite loose." Tr. 216. She had full 5/5 strength in the upper and lower extremities. Id. She could use her hands and arms normally. Id. Gait was normal. Id. She was a "little off balance on heel walking" but could toe walk and tandem walk. Id.

On November 9, 2000, Charles Spray, M.D., an internist, completed a records review of Ms. Wilson and opined that she was able to lift up to 50 pounds occasionally and up to 25 pounds frequently; stand and walk about six hours out of an eight-hour work day; and sit about six hours out of an eight-hour work day. Tr. 173. However, Dr. Spray concluded that Ms. Wilson had nonexertional limitations, including memory problems, seizures, pain from migraines, and fatigue, and that the alleged severity of

OPINION AND ORDER Page 13

her symptoms were attributable to a medically determinable impairment and consistent with the total medical and nonmedical evidence. Tr. 177.

On December 12, 2000, Ms. Wilson told Dr. Hansen she was leaving on a 6+ month trip in a motor home with her partner. Tr. 219. She requested a refill of her medications, stating that she remained stable on the present regimen of Dilantin and Effexor, with the Effexor controlling her depression and no recent seizure activity. Id.

On May 30, 2001, Dr. Hansen wrote that Ms. Wilson continued to have some headaches with migraines. Tr. 243. She was unable to afford the Imitrex. Id. She continued to take Effexor for depression. Id.

In a letter dated May 13, 2002, optometric physician Annette Webb reported from Hot Springs, Arkansas, that Ms. Wilson had been given an eye health evaluation on December 6, 2001, at which it was found that her best corrected vision in her left eye was only 20/80. Tr. 237. Dr. Webb wrote,

> It is my impression that the eye health is free of any pathology, however, the effect of the brain tumor of the optic nerve has decreased her level of vision in her left eye. This decrease in vision is unaffected by conventional means of correction, and therefore, this patient cannot be corrected to any better than 20/80 in her left eye.

Id.

On May 13, 2002, Ms. Wilson saw Galen Griffin, M.D., in Dr. Hansen's office, for migraine headache. Tr. 277. Dr. Griffin wrote that Ms. Wilson was stressed because she lost her disability status. Although Ms. Wilson reported that she was not currently

OPINION AND ORDER Page 14

having a headache, she requested a refill on Imitrex. She also reported having had a petit mal seizure about three weeks previously. Id.

On May 22, 2002, Dr. Griffin reported that Ms. Wilson's husband had called saying she was experiencing more frequent seizures. Id. Her Dilantin was increased to 600 mg. daily. Id.

On July 10, 2002, Ms. Wilson was given a neuropsychological screening by Cheryl Brischetto, Ph.D. Tr. 246. Ms. Wilson told Dr. Brischetto her stepfather physically abused her and "tried" to sexually abuse her, but "I didn't go along with it." Tr. 247. Dr. Brischetto noted that this report varied from Ms. Wilson's previous reports to examiners, in November 1996 and September 2000, of sexual abuse, as well as physical abuse, by her stepfather. Id. Dr. Brischetto also noted some inconsistencies in Ms. Wilson's descriptions of her childhood. Id.

Ms. Wilson admitted that she had worked about 40 hours a week while receiving disability benefits, but said this was a "slowed bartending job," with only a couple of customers per day. Tr. 248. Ms. Wilson reported a suicide attempt in the remote past by taking all of her Dilantin; Dr. Brischetto noted that this differed from the account given to Dr. Northway of a suicide attempt by running a hose from the tailpipe into her car. Tr. 250.

Ms. Wilson complained of difficulty remembering and concentrating. Tr. 251.

On the WAIS-III, Ms. Wilson's full scale score was 82 (low average range), her verbal IQ was 89 (low average), and her

performance IQ was 77 (borderline).

Ms. Wilson completed the MMPI-2, slowly. Id. Although the profile obtained was valid, Dr. Brischetto thought it "very likely that her responses on the MMPI are confounded by her neurologic problems and cognitive problems." Id. Dr. Brischetto continued:

> She generally appears to be an individual who is concerned about physical functioning. Although her codetype might suggest somebody whose physical symptoms may be a manifestation of emotional issues, this may be invalid given the confounds present on the MMPI. There were elevations on clinical scales relating to somatic focus, which is so understandable given her situation. There was also some elevation on depression. The elevation on the schizophrenia scale does not likely represent psychotic thought process or schizophrenia so much as problems related to concentration and attention, which probably are related to her cognitive problems. She seems to be an individual who is reporting at least some mild emotional distress. She seems to have low self-concept. ... There was an elevation on Work Interference suggesting she may be expressing attitudes and behaviors that could contribute [to] poor work performance. this elevation may also relate some to lack of energy toward work related activity.

Tr. 255-56.

Dr. Brischetto did not believe that Ms. Wilson's low scores on memory testing (mostly extremely low and borderline range) reflected her true ability. Tr. 256. Effort testing "did raise some question about inconsistent effort or even an actual effort to exaggerate memory problems." Id. Dr. Brischetto thought there might also be some impact on Ms. Wilson's memory from the increase in her Dilantin dosage. Id. Dr. Brischetto noted that Ms. Wilson appeared to be doing worse on the WMS-III than she had done in 2000. Id.

Dr. Brischetto thought Ms. Wilson seemed able to follow simple directions, but that she had difficulty with more complex and

OPINION AND ORDER Page 16

multistep directions. Tr. 257. Dr. Brischetto did believe that given her history of right frontal tumor and seizure disorder, Ms. Wilson had some cognitive deficits, and she supported the diagnosis of Cognitive Disorder NOS. Id. Dr. Brischetto thought Ms. Wilson's cognitive functioning might be somewhat improved with less sedation from the Dilantin, although it was questionable whether such a lower dosage would enable Ms. Wilson to remain seizure-free. Id.

Dr. Brischetto disagreed with the diagnosis of Borderline Intellectual Functioning, noting that Ms. Wilson tested average on several subtests. Id. She opined that summary scores, when there is such scatter among subtests, "can be misleading." Id.

Dr. Brischetto did not believe Ms. Wilson was clinically depressed and she did not think there was any clear indication of organic affective disorder. She did not see any "gross examples of social disinhibition," or any indication of anxiety disorder. Id.

Dr. Brischetto concluded,

> From a cognitive standpoint, she certainly seems able to follow simple directions; however, physical factors such as her fatigue level for persistence in a work-related setting, and any impact of work-related stress on her seizure disorder should be addressed by her medical doctor. She is likely to do best with some compensatory strategies and structure to compensate for her cognitive weaknesses.

Tr. 258. Dr. Brischetto assessed Ms. Wilson's current GAF at 50.

Dr. Brischetto completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). Tr. 260. She found that Ms. Wilson had moderate to marked ability to understand and remember detailed instructions and to carry out detailed instructions. Id. Dr. Brischetto also found moderate limitations on Ms. Wilson's

OPINION AND ORDER Page 17

ability to interact appropriately with the public, interact appropriately with supervisors, and interact appropriately with co-workers, and moderate to marked limitation on her ability to respond appropriately to work pressures in a work setting. Tr. 261.

On May 1, 2003, Ms. Wilson saw Nancy Zink, M.D., for medication refills. Tr. 315. She reported that her mother was dying in Washington state and she felt unable to help. She reported difficulty sleeping and becoming tearful easily. Id. She also reported small seizures during the night during the previous two months and her husband reported "staring episodes" lasting less than 30 seconds. Id. Ms. Wilson was taking 600 mg. and 700 mg. of Dilantin on alternating days. She complained of her head feeling swollen in her right temple area and toward the crown. Id. Dr. Zink refilled her Effexor and told her to follow up if her depression did not improve. Dr. Zink also wondered whether the episodes during the night were truly seizures. Id.

### Hearing Testimony

Ms. Wilson testified at the hearing that her major problems were that she had grand mal seizures when she got tired or stressed, tr. 344, migraines that sometimes lasted for weeks, tr. 345, and poor vision in her left eye. Tr. 249. The migraines were improved with Imitrex, but she was unable to afford it. Tr. 350. She and her husband, who is disabled, live in a 36-foot motor home, and her husband does the driving. Tr. 345-46, 365. Ms. Wilson testified that she has grand mal seizures every month, tr. 349, which leave her "wiped out" afterward. Tr. 350. She said her memory

OPINION AND ORDER Page 18

has become worse during the past two years. Tr. 351.

The ALJ called a vocational expert (VE), Elayne Leles. Tr. 368. He asked her to consider an individual of Ms. Wilson's age and education, able to lift 50 pounds occasionally and 25 pounds frequently, stand or walk six hours a day, limited from hazards such as moving machinery or equipment and unprotected heights, and further limited to simple, repetitive tasks. Tr. 369. Ms. Leles opined that such an individual could work as an addresser, a sedentary, unskilled job; a hand packager, which is medium and unskilled; and as a telephone quotation clerk, which is sedentary and unskilled. Tr. 370.

### ALJ's Decision

The ALJ found that Ms. Wilson's impairments were a seizure disorder and a cognitive disorder, which were severe. Tr. 27. He found Ms. Wilson's testimony not entirely credible because there was no evidence to show a worsening of her functional limitations, or the advent of any other severe physical impairment, since the prior decision terminating her benefits. Tr. 22. In fact, the ALJ found that her condition had improved.

The ALJ stated that he had given careful consideration to Dr. Truhn's opinion that Ms. Wilson would have difficulty working, and that her shaking and twitching would "severely interrupt" her concentration and attention. Id. The AlJ discounted Dr. Truhn's opinion because Ms. Wilson's MMPI results "indicate an element of possible malingering for secondary gain." Id. Additionally, the IQ scores in April 2000 were lower than her average IQ values in 1995,

OPINION AND ORDER Page 19

and other tests. Id. The ALJ noted further that Dr. Brischetto did not find Ms. Wilson as limited as Dr. Truhn had.

The ALJ stated that he had also "carefully noted" Dr. McConochie's findings, but discounted them because there was "an indication of secondary gain, and evidence that the claimant's memory functioning was not as impaired as her test scores would indicate." Tr. 23. The ALJ thought that "factor suggests some element of exaggeration in the claimant's performance." Id. [3]

The ALJ found that the psychological records review evaluation done by Dr. Rethinger in September 2000 was "inconsistent with the credible report from Dr. Brischetto." Tr. 25.

The ALJ noted that in September 2000, Dr. Hansen had reported that Ms. Wilson was free of seizures with Dilantin. The ALJ found that this report "suggests that the claimant has no significant symptoms when she complies with medication." Id.

The ALJ also noted Ms. Wilson's report to Dr. Hansen in December 2000 that her seizures were well controlled with medication. Id. At that time, she began an extended motor trip throughout the United States and Canada, and she reported in July 2002 that she intended to continue traveling. Id. The ALJ observed,

---

[3] The ALJ cited page 7 of Dr. McConochie's report (tr. 212) as evidentiary support for these findings. However, I find nothing on that page, or anywhere in Dr. McConochie's report, to suggest an "indication of secondary gain." Nor is there any statement by Dr. McConochie in his report that Ms. Wilson's memory functioning was not as impaired as her test scores would indicate. Indeed, Dr. McConochie specifically noted that Ms. Wilson had borderline intellectual and memory functioning, "as documented by current testing and testing in April of this year" [i.e., the testing done by Dr. Truhn]. Tr. 212.

"Although a vacation and a disability are not mutually exclusive, this extensive travel suggests that the claimant's alleged limitations have been overstated. Particularly where her husband is disabled and it was only the two of them traveling." Id.

The ALJ found that Dr. Webb had reported some loss of vision in Ms. Wilson's left eye that could not be corrected, but that Ms. Wilson was still able to drive, read and take care of personal care and shopping. Consequently, "[t]here is no evidence that the claimant is significantly limited by a visual difficulty." Tr. 24.

The ALJ relied primarily on the psychological evaluation of Dr. Brischetto. Dr. Brischetto found that Ms. Wilson's scores on the WRAT-3 and the WAIS-III vocabulary tests were average; that her memory index was very low to borderline, and that other testing ranged from borderline to average. Tr. 24. The ALJ also noted that IQ testing showed a full-scale IQ of 82. Id.

The ALJ noted that although Dr. Brischetto found Ms. Wilson's MMPI-2 test results valid, a TOMM test suggested that her scores might have been affected by exaggeration, and that her actual ability was better than testing indicated.[4]

---

[4] Dr. Brischetto stated in her report that Ms. Wilson's performance on the Test of Memory Malingering (TOMM) gave some concern based upon formal effort testing that there may have been some inconsistent effort or some possible intention to create an impression of more memory problems than may actually exist. Based upon these two measures, it is very possible that her scores on formal testing of memory may actually underreflect her true ability. It should be noted that there may also be some confounding effects from her increase in Dilantin, which she said made her somewhat more groggy in the last couple of weeks.

The ALJ gave great weight to Dr. Brischetto's conclusions that Ms. Wilson did not have borderline intellectual functioning or clinical depression; that she had a cognitive disorder and a provisional diagnosis of personality change due to tumor removal; and that Ms. Wilson could perform simple tasks, but with some difficulty relating to the public, co-workers and supervisors and some difficulty handling stress. Tr. 24.

In the ALJ's opinion, "[o]verall, the evidence shows that the claimant's psychological evaluations have been tainted by malingering or poor effort." Tr. 24. The ALJ found that Ms. Wilson's depression was "very well controlled by medication" and was not a severe impairment, and that the "credible evidence does not show [borderline intellectual functioning] as a severe impairment." Id. The ALJ found further that Ms. Wilson's headaches were successfully treated by medication.

The ALJ found that Ms. Wilson was no longer able to perform her past relevant work, but that she retained the residual functional capacity to perform medium work, except for being restricted from climbing ropes, ladders and scaffolds and from such hazards as moving machinery, equipment, and unprotected heights, and being restricted to simple, repetitive tasks. Tr. 28. This finding was based on the ALJ's acceptance of Dr. Spray's physical assessment. Tr. 25.

Based on the testimony of the VE, the ALJ found that Ms. Wilson could not return to her past relevant work, but that she

---

Tr. 252.

OPINION AND ORDER Page 22

retained the residual functional capacity to work as an addresser, hand packager, and telephone clerk. Id.

### Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

OPINION AND ORDER Page 23

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

OPINION AND ORDER Page 24

substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, she is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, she is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform her past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

When, as here, the Commissioner has terminated a claimant's benefits and that termination has been upheld after review by the district court, the principles of res judicata apply. See <u>Chavez v. Bowen</u>, 844 F.2d 691, 693 (9th Cir. 1988). The previous adverse final determination gives rise to a presumption of continuing nondisability, which a claimant can overcome by proving "changed circumstances" indicating a greater disability. <u>Id.</u>

### Discussion

Ms. Wilson asserts that the ALJ erred in several respects. First, she points out that the ALJ failed either to accept or

reject the findings of Dr. Northway, among them Dr. Northway's specific finding that she showed no signs of symptom exaggeration, distortion or malingering.

Secondly, Ms. Wilson contends that no examining doctor ever mentioned the word malingering or even included malingering as a rule-out diagnosis. She argues that the ALJ's attempt to construe Ms. Wilson's functional behavior as malingering has no basis in the medical evidence.

Third, she argues that the ALJ's reasons for rejecting the opinions of Dr. Truhn and Dr. McConochie are unsupported by the evidence.

Fourth, she contends that the ALJ only gave selected parts of Dr. Brischetto's opinion "great weight," and ignored the parts that did not support his finding of non-disability, such as Dr. Brischetto's GAF score of 50 and her opinion that Ms. Wilson had moderate to marked impairments in the ability to understand and remember detailed instructions; carry out detailed instructions; and respond appropriately to work pressures in a normal work setting, and that she had moderate impairments in the ability to interact appropriately with the public, supervisors, and co-workers. Ms. Wilson argues that even the limitations found by Dr. Brischetto were not included in the hypothetical question to the VE.

And finally, Ms. Wilson argues that the ALJ ignored the side effects of her medication, particularly Dilantin, which Dr. Brischetto thought could have a confounding effect on her test

OPINION AND ORDER Page 26

1 | performance.

2     The Commissioner argues that the ALJ properly applied the
3 presumption of continuing nondisability, based on the termination
4 of her benefits in January 1997. The Commissioner argues that Ms.
5 Wilson has failed to overcome that presumption by showing that her
6 condition had become worse after August 27, 1998. The Commissioner
7 contends that there is no evidence to support a finding of
8 worsening in her cognitive disorder and seizure disorder, and in
9 fact the evidence supports the ALJ's conclusion that her conditions
10 had improved from the time of her prior period of disability,
11 August 25, 1993 to January 1, 1997. The Commissioner notes that Ms.
12 Wilson has stated that she has no seizure activity when she
13 complies with her medication, tr. 220, and that in September 2000
14 and December 2000, she reported that her seizures were well
15 controlled with medication. The Commissioner also relies on the
16 findings by Doctors Truhn, McConochie and Brischetto indicating no
17 worsening of her cognitive disorder, and on the neurological
18 examination in October 2000 by Dr. Bufton, indicating improved
19 mental status.

20     1.  ALJ's failure to accept or reject findings of Dr.
21            Northway.

22     Ms. Wilson asserts that the ALJ erred when he failed to
23 consider the findings of Dr. Northway. This argument is
24 unpersuasive. Dr. Northway evaluated Ms. Wilson in 1996. The issue
25 presented by this case, however, is whether Ms. Wilson has
26 presented evidence sufficient to overcome the presumption of
27 continuing nondisability after her benefits were terminated--that

28 OPINION AND ORDER Page 27

is, whether she can demonstrate that her condition has worsened since her benefits were terminated. Assuming that Dr. Northway's findings established her baseline condition, the record does not contain evidence supporting a conclusion that her condition worsened thereafter. Therefore, if the failure to accept those findings was error, it was harmless error because Dr. Northway's findings cannot establish a worsening of Ms. Wilson's condition after January 1, 1997.

    2.    ALJ's rejection of the opinions of Dr. Truhn and Dr. McConochie

Doctors Truhn and McConochie saw Ms. Wilson in 2000. Ms. Wilson argues that the ALJ failed to include in his hypothetical to the VE the opinions of Doctors Truhn, McConochie, and Brischetto that she had physical tremulousness and shakiness in her hands, as well as significant cognitive and memory problems.

The ALJ must propose a hypothetical that is based on substantial evidence in the record that reflects each of the claimant's limitations. Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th Cir. 2001). An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence. Id. at 1165.

The ALJ's hypothetical question to the VE included limitation to simple, repetitive tasks. I conclude, therefore, that the ALJ did consider Ms. Wilson's cognitive and memory limitations in questioning the VE.

The ALJ did not include tremor of the hands or unsteadiness of gait in the hypothetical question to the VE, except to the extent

OPINION AND ORDER Page 28

that he limited her from work involving moving machinery or equipment and unprotected heights. Ms. Wilson argues that her tremulousness and shakiness precluded her from working as a hand packager, and that Dr. Brischetto's observation that she "could barely manage to control a pencil" contradicts the ALJ's finding that she had the residual functional capacity to be an addresser.

The evidence shows that Dr. Truhn observed that Ms. Wilson's eye contact was fleeting because of headshakes and eye twitches, and that her gait was slow and unsteady with poor balance. Dr. Truhn thought Ms. Wilson would have difficulty working because her shaking and twitching would interrupt her *concentration*, not her gross or fine motor skills.

Dr. McConochie noted that Ms. Wilson's hands seemed "somewhat tremulous," and Dr. Brischetto reported that Ms. Wilson's gait seemed "slightly unsteady at times," that she "seemed to have a shaky quality to her hands" which was "evident in some of her drawings." Ms. Wilson told Dr. Brischetto that the tremor in her hands tended to slow her writing activities.

However, I find nothing in Dr. Brischetto's report to the effect that Ms. Wilson could barely manage to control a pencil. In fact, Dr. Brischetto noted that Ms. Wilson told her that she wrote letters to family members in Europe and that she was physically capable of driving their motor home. Tr. 251.

Further, the medical evidence from two neurologists, Doctors Bufton and Fitzgerald, contradicts Ms. Wilson's assertion that she is vocationally impaired by tremor in her hands and unsteady gait.

Dr. Bufton found upon examination that Ms. Wilson had full strength in the upper and lower extremities, that she could use her hands and arms normally, and that her gait was normal. Tr. 216. Although Dr. Fitzgerald noted in her report that Ms. Wilson was "mildly tremulous and mildly unsteady," she opined that Ms. Wilson would "certainly be able to engage in the functional activities described," including lifting five pounds occasionally, sitting and standing for several hours per work day, manipulating objects, and being independently mobile outside the home.

The ALJ is responsible for resolving conflicts in medical testimony, and for resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Social Security regulations give more weight to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists. Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(5). Doctors Truhn, McConochie and Brischetto are all psychologists; Doctors Bufton and Fitzgerald are neurologists. In view of the neurologists' physical findings, the observations of psychologists Truhn, McConochie and Brischetto did not require the ALJ to find Ms. Wilson impaired by tremors or unsteady gait. I find no error.

3. Evidence of malingering and the ALJ's credibility findings

Ms. Wilson asserts that the ALJ improperly rejected her hearing testimony, arguing that because there is no evidence in the record of malingering, the ALJ was required to give clear and convincing reasons for finding her not fully credible. Unless there

is affirmative evidence showing that a claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).

Ms. Wilson notes Dr. Northway's specific finding that she appeared to have "no obvious signs of symptom exaggeration, distortion or malingering," and the absence of any other evidence of malingering. However, the ALJ found evidence of malingering from the MMPI administered by Dr. Truhn (Dr. Truhn found that individuals responding to the MMPI as Ms. Wilson did tended to present with somatic complaints, with secondary gain associated with the symptoms, tr. 203); and from Dr. Brischetto's administration of the TOMM. Dr. Brischetto opined that Ms. Wilson's performance on the TOMM and on Memorization of 15 Items presented some concerns that "there may have been some inconsistent effort or some possible intention to create an impression of more memory problems then [sic] may actually exist." Tr. 252. Dr. Brischetto thought it "very possible that her scores on formal testing of memory may actually underreflect her true ability," but qualified this finding with the statement that there might also be "some confounding effects from her increase in Dilantin." <u>Id.</u>

I do not find the evidence from Dr. Truhn and Dr. Brischetto strongly probative of malingering, but neither do I agree with Ms. Wilson's argument that the evidence does not support the ALJ's adverse credibility finding.

The evidence in the record which most strongly undermines Ms.

OPINION AND ORDER Page 31

Wilson's testimony that her impairments prevent her from working is her admission to Dr. Brischetto in 2002 that she lost her disability benefits because she was working about 40 hours a week as a bartender, although she characterized this job as "slowed," with only a few customers a day. Tr. 248. See also tr. 200 (Ms. Wilson's statement to Dr. Truhn that Social Security discovered she had been working and "cut me off.")

The ALJ also disbelieved Ms. Wilson's testimony because her reported symptoms were inconsistent with the extended motor home trips she reported to Doctors Hansen and Brischetto. Although Ms. Wilson argues that she and her husband reside in a motor home because they cannot afford a house, and that "far from gallivanting about, they tended to drive to a location and park for extended periods when they could find trailer parks offering low space rent," this assertion is undermined by Ms. Wilson's testimony that their motor home is 36 feet long, tr. 365, by her report to Dr. Hansen in December 2000 that she was leaving for a six month trip in the motor home with her husband, tr. 219, and by her report to Dr. Brischetto that she and her husband had just returned from an extended motor home trip that lasted from Christmas Eve of 2001 to June of 2002, during which they had traveled to Reno to get married, to Maine to have lobster, to Niagara Falls and Canada, to the Great Lakes, to Pennsylvania and Kentucky, to Tennessee to visit Graceland, and to Arkansas and Florida. Tr. 246, 251. Ms. Wilson also told Dr. Brischetto that although they had spent the previous month in a trailer park, they were hoping for some

continued traveling, perhaps to Montana, before winter. Tr. 246.

I agree with the ALJ that the evidence of such extensive travel is inconsistent with claims of disabling seizures, severe cognitive and memory deficits, migraines, and depression.

I find no error in the ALJ's conclusion that Ms. Wilson's extensive travel, with her only companion being her disabled husband, suggested that Ms. Wilson's alleged limitations were overstated.

4.    ALJ's failure to consider seizures and cognitive and memory impairments in combination

Ms. Wilson asserts that the ALJ erred because he failed to consider the combined effects of her seizures and her cognitive and memory impairments on her residual functional capacity.

In deciding whether ALJ's decision was supported by substantial evidence, court must consider the effect on the claimant's residual functional capacity of all the claimant's impairments which are found to be severe, regardless of whether any single impairment is of sufficient medical severity to equal a listed impairment. <u>Gregory v. Bowen</u>, 844 F.2d 664, 666 (9th Cir. 1988); 42 U.S.C. § 1382c(a)(3)(G); see also 20 C.F.R. § 404.1523. The ALJ found that Ms. Wilson's seizure disorder and cognitive disorder were severe impairments.

I find no indication that the ALJ failed to assess adequately the seizures and the cognitive and memory impairments. Substantial evidence in the record shows that Ms. Wilson's reported seizure activity is nocturnal and well-controlled by medication. See, e.g., tr. 219 (Ms. Wilson's report in December 2000 to Dr. Hansen that

OPINION AND ORDER Page 33

her seizures were well controlled with medication and that she had no recent seizure activity); tr. 243 (report to Dr. Hansen in May 2001 that she was vulnerable to seizures only if she missed a dose of Dilantin); tr. 251 (report to Dr. Brischetto in July 2002 that she only had seizures at night); tr. 315 (report in May 2003 to Dr. Zink of small seizures during the night and staring episodes; Dr. Zink wonders whether the nocturnal episodes are truly seizures).

Further, I conclude that the ALJ did include, in his hypothetical question to the VE, limitations based on the symptoms of both seizure disorder and cognitive disorder; he precluded her from climbing and work around moving machinery, equipment and unprotected heights, and he restricted her to simple, repetitive tasks.[5] I conclude that the ALJ properly considered Ms. Wilson's seizure disorder and cognitive deficits in combination when assessing her residual functional capacity.

> 5. ALJ's findings that Ms. Wilson's depression, headaches, and poor eyesight were not severe impairments

Ms. Wilson asserts that the ALJ erred when he found that her depression, migraine headaches, and poor eyesight in her left eye were not severe impairments that limited her residual functional capacity. An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work. Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1996). An

---

[5] Dr. Brischetto specifically opined that "[f]rom a cognitive standpoint, [Ms. Wilson] certainly seems able to follow simple directions." Tr. 258.

impairment that is under control cannot support a finding of disability. <u>Celaya v. Halter</u>, 332 F.3d 1177, 1185 (9th Cir. 2003)(Rawlinson, J., dissenting); <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1992)(upholding ALJ's finding of nondisability where the impairments were stabilized).

Substantial evidence in the record supports the ALJ's finding that Ms. Wilson's depression was not severe and that both her depression and her headaches were controlled by medication. The evidence from examining psychologists, spanning the period from 1996 to 2002, contains no diagnosis of depression, severe or otherwise. Dr. Northway diagnosed adjustment disorder with mixed anxiety and depressed mood, tr. 234. Dr. Truhn diagnosed dysthymic disorder, tr. 204, as did Dr. McConochie, tr. 212. Dr. Brischetto found no evidence of depression, and made only a "rule out" diagnosis of dysthymia. Tr. 258. Dysthymic disorder is not generally considered a severe impairment:

> [D]ysthymic disorder is a chronic mood disturbance involving either a depressed state or a loss of interest or pleasure in almost all usual activities and pastimes .... It is a less severe condition than a major depressive episode and occupational impairment is usually mild to moderate because of the chronic, rather than severe nature of the syndrome.

<u>Ramirez v. Shalala</u>, 8 F.3d 1449, 1455 (9th Cir. 1993)(Rymer, J. dissenting)(quoting from <u>Perez Torres v. Secretary of HHS</u>, 890 F.2d 1251, 1254-55 (1st Cir. 1989).

Substantial evidence in the record supports the ALJ's finding that Ms. Wilson's depression was not severe because it was well controlled by medication. See tr. 209 (report to Dr. McConochie in

OPINION AND ORDER Page 35

September 2000 that Effexor helps her depression); tr. 243 (chart note dated December 12, 2000 that Ms. Wilson reports the Effexor "has controlled her depression well"); tr. 243(chart note from Dr. Hansen dated May 30, 2001 continuing Ms. Wilson on Effexor for depression); tr. 250-51 (report to Dr. Brischetto in July 2002 that she sleeps well and has a healthy appetite; she denies suicidal or homicidal ideation, plan or intent; denies being weepy for no apparent reason; denies problems with anxiety or panic; denies temper outbursts); tr. 253 (Dr. Brischetto's observation that Ms. Wilson's expressive language is generally clear and coherent, without obvious problems with fluency or articulation and that she is not excessively tangential; her thinking seems logical and organized, she seems to have emotional insight, persistence is adequate, and she does not appear distracted); tr. 255 (Dr. Brischetto finds no symptoms consistent with clinical depression during the past two weeks on the Beck Depression Inventory). See also tr. 209 (Ms. Wilson's statement to Dr. McConochie in September 2000 that she has never had counseling or therapy).

The record also contains substantial evidence to support the AlJ's finding that Ms. Wilson's migraines are controlled by medication. See tr. 224 (April 1999 report of "excellent response" to Amerge for migraines); tr. 240 (May 1999 report to Dr. Fitzgerald that Amerge once a week is helpful for migraines, and that she takes three to four Excedrin for milder headaches); tr. 223 (June 1999 report to Dr. Hansen that Amerge is "effective in management of her migraines"); tr. 221 (report in April 2000 of

"good results with use of Amerge"); tr. 209 (September 2000 report to Dr. McConochie that Tylenol with codeine and Excedrin are helpful for her migraines); tr. 249 (report in July 2002 to Dr. Brischetto that Excedrin and Imitrex "really help" her migraines, but are expensive).

The ALJ's finding that Ms. Wilson's nearsightedness in her left eye was not severe is also supported in the record. In July 2002, according to Dr. Brischetto's report, Ms. Wilson denied any visual difficulties in reading or seeing testing materials. Tr. 254. She also told Dr. Brischetto that she was physically capable of driving the motor home. Tr. 251.

6. ALJ's failure to consider side effects of medications

Ms. Wilson asserts that the ALJ erred because he failed to assess the effect of her medications on her residual functional capacity. Because the side effects of medication can affect an individual's ability to work, the court considers them in disability determinations. <u>Varney v. Secretary of Health & Human Services</u>, 846 F.2d 581, 585 (9th Cir. 1988).

Ms. Wilson does not claim, and there is no evidence of, adverse side effects from the Effexor Ms. Wilson takes for depression. The medical evidence shows that Ms. Wilson has been on anti-seizure medication since approximately 1976, when she had her first seizures. Tr. 239. The record as a whole indicates that except for a brief period in the past on Depakote, Ms. Wilson has taken Dilantin. Because she has taken Dilantin for many years, the side effects of Dilantin do not constitute a "changed circumstance"

OPINION AND ORDER Page 37

1  that is relevant to the question of whether Ms. Wilson has overcome

2  the presumption of continuing nondisability. See <u>Chavez</u>, 844 F.2d

3  at 693.

**Conclusion**

5  Because Ms. Wilson's disability benefits have previously been

6  terminated, she is now required to overcome a presumption of

7  continuing nondisability by showing changed circumstances since the

8  last determination that establish greater disability. The evidence

9  shows that Ms. Wilson's seizure activity is essentially unchanged

10  and significantly controlled with medication. Although there was

11  evidence from Doctor Truhn of borderline IQ in 2000, Dr.

12  Brischetto's IQ testing in 2002 placed Ms. Wilson within

13  approximately the same range (average to low average) as her

14  testing in 1996, and the ALJ resolved the conflict in the evidence

15  by accepting that of Dr. Brischetto. The "low average" aspect of

16  Ms. Wilson's cognition was addressed by the ALJ in his hypothetical

17  question to the VE limiting her to simple, repetitive tasks.

18  The ALJ's findings that Ms. Wilson's depression, headaches,

19  and nearsightedness in her left eye are not severe impairments

20  indicating a worsening in her condition are supported by the

21  record, as discussed above. There is no indication in the record

22  that the side effects of Dilantin are worse than they were when her

23  benefits were terminated. I conclude that Ms. Wilson has failed to

24  overcome the presumption of continuing nondisability, and that the

25  ALJ's decision is supported by substantial evidence in the record

26  and free of legal error.

27

28  OPINION AND ORDER Page 38

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this 18th day of October 2005.

_____
Dennis James Hubel
United States Magistrate Judge